We have a substitute counsel today. Thank you. I'm not Jimmy Blair. May it please the Court, Jeremy Warren, on behalf of the appellate Mr. Morris, who is serving the 148-month sentence imposed by the District Court Judge Moskowitz. Your Honors, in this case, this was a telemarketing fraud trial that was a lengthy trial. In pretrial, most of the defendants, including Mr. Morris, moved for severance under a variety of – on a variety of grounds, including the concern that there would be mutually exclusive or inconsistent defenses between, in this case, Mr. Morris and the attorney who was at trial, Mr. Leonard, who was represented by Gene Iredale from San Diego. Throughout the trial, I looked at the record last night, there were nine times during the trial that not only was our concern pretrial that this mutually exclusive defense would prejudice my client, did that happen, it's worse than what we had thought. And, in fact, as you see in the briefs, we cited two cases and points at the trial in which both the Court and the government expressed concern about the intensity with which Mr. Leonard's attorney was attacking Mr. Einhorn, who was the attorney from whom my client, Mr. Morris, relied on for his defense, which was advice of counsel. The problem, the test for inconsistent defenses is so severe, you know, could the jury acquit one without having to convict the other, and vice versa. I don't see why a jury couldn't say, well, Leonard said that this whole operation was crooked, but he didn't know what was going on. I mean, you know, it just, they were rogues or something. And this lawyer, Einhorn, was hopelessly crooked. And then the jury could accept that testimony and then say, well, when a lawyer is crooked and giving crooked advice, your client could have relied on that innocently. I understand the Court's concern, and it's certainly real inevitable inconsistency. I understand the Court's concern, but that wasn't how the, I believe, how the evidence came out, and that certainly wasn't the argument that counsel made. Mr. Morris's defense was the advice of counsel. I went to Einhorn. I talked to him. I revealed everything, and I, in good faith, relied upon his advice. Mr. Leonard's defense, and I understand, he had two-pronged defense. Part of it was, look, I'm just a, I'm an attorney, but I'm a fool, and I was hoodwinked by Einhorn as well, but it was more than that. And the core of it, and I want to talk about specific, I think the one piece of evidence that came in that most prejudiced Mr. Morris, but the core of it was Einhorn is a kingpin. He's a leader of this fraud. He's not just a corrupt attorney, but he was part and parcel. He was a director of this fraud, and he, that was conveyed to all the defendants, including Morris. And I think when you look at the standards set by Zafiro in the Ninth Circuit cases, I agree it's a very high standard, but the question is, did any specific trial right of the defendant who's now complaining about it, was that violated? And you have to look at what were the specific trial rights. Well, one of the specific trial rights is the right to be convicted entirely upon competent evidence that's admissible solely against me. The attorney for Mr. Leonard introduced, through a number of witnesses, something that I believe is, should never have been admitted at this trial. The government, I believe, never would have been permitted to admit this in a separate trial, but that is the advice of Attorney Einhorn to various alleged co-conspirators, including Mr. Morris, to invoke. And we put it in our briefs. There are a number of points at which he, Mr. Leonard's attorney, through cooperating witnesses, said, well, you sat down with Mr. Einhorn. You had this attorney-client meeting, and he told you, don't answer questions. You knew the answers. He told you, don't talk. Don't answer deposition questions. Don't answer questions under oath or by any investigators that would admit anything that would, that could implicate you in a crime. Now, the invocation of what is tantamount to the invocation of right to counsel or Fifth Amendment privilege against self-incrimination, that has no place in the trial. And I think that so undercut the defense that Mr. Morris was attempting to portray, which is, I listened to Einhorn. I talked to Einhorn. He seemed like a reasonable attorney to me, and I reasonably followed his advice. I think that's mutually exclusive. I think that that was the core of Mr. Leonard's defense in the case. And I think if it was credited, and it appears to be more or less credited, the jury hung and they did not acquit, but they hung on Mr. Leonard and they convicted Mr. Morris. If that evidence is credited, it just makes it possible of reliance on counsel defense because the jury's finding that not only was Einhorn a conspirator, but that Morris was aware of that. And so that's the core of our argument on separate. The testimony was that your lawyer told you not to answer questions. Correct. I don't think the judge let him say, use the Fifth Amendment. Exactly. But I agree, Your Honor, that those magic words were never used. But I think given today's day and age in television shows, everyone in the courtroom understood exactly what was going on there, that he was advising people to invoke their Fifth Amendment privileges. But I agree, those particular words, I was not trial counsel, but I imagine that Judge Moskowitz instructed the attorney not to use those particular terms. But still, I think that it so thoroughly deprived Mr. Morris of an opportunity to prevent his case. This was a case in which severance should have been granted. We understand for judicial economy and judicial efficiency under Rule 14, Rule 8, that there's a presumption in favor of it. But it's precisely in cases like this where you have a multi-month trial involving multiple defendants that I think the Court of Appeals has to take a close look at the actions of the district court because the district court judge is the one who has to live with this mess and has to consider, do I want to try this twice? So while on the one hand, the rule promotes judicial economy, it also, in my opinion, promotes, it creates an opportunity for judges thinking about, you know, their own concerns in terms of their schedule, particularly in San Diego, where we have the busiest district court in the country, from what I understand, to err on the side of, well, you know, let's see if we can cure it by curative instructions. In this particular case, the curative instructions came late. They were the generic, consider each defendant, the evidence against each defendant individually. Your decision on one should not influence the decision on another. But I don't believe that there was any point during which this very damaging evidence came out against, related to the hearsay statements of Mr. Einhorn, the attorney, where limiting instruction was given. And it should have been, there should have been given a limiting instruction that this evidence was primarily for, or only for consideration as to Mr. Leonard. And so I think for those grounds, the conviction should be reversed. In terms of, I'd like to turn to the sentencing issue, unless the Court has any questions. The timeframe on the sentencing in this case was kind of unusual. The trial resolved in 2002, but Mr. Morris was not sentenced until 2005, and it had to do with replacement of counsel and motions for new trial. At the time that the sentencing occurred, the Booker decision had come down. The Ameline decision had just come down, I think, within a matter of weeks or months before the sentencing. The district courts, from my experience and from reading the record in this case, were struggling with how to apply the 3553 factors. I think Judge Moskowitz, as you see from the briefing and certainly in the record, the briefing for the initial sentencing hearing, the defense position was that any enhancement beyond just the basic offense level, base level six for fraud, had to have been alleged in the indictment, proven to a jury beyond a reasonable doubt. And we now know from subsequent case law that that's not the case, that the district court can make those decisions. First of all, the $49 million loss was the entirety of the conspiracy. The evidence was that Mr. Morris was the leader of an independent sales office in Los Angeles, that his particular group of telemarketers had raised approximately $3.5 million, and granted the sentencing guidelines permit the court to find reasonably foreseeable conduct of co-conspirators. But in this case, I don't think there was sufficient evidence to conclude by clear and convincing standard to so dramatically increase the sentence to go from $3.5 million in loss all the way up to $49 million of loss. The evidence was at trial that there was a whole branch to this conspiracy that took place in Florida that raised about half of the money that was involved, over $20 million, and there was no evidence tying Mr. Morris to that particular part of it. And beyond that, Your Honors, the – I think it's important to consider that two documents found that there was no need to deter Mr. Morris in the future. He said he's learned his lesson, he knows. Evidence was presented that from the time of the offense, which was back in the early 90s up through trial, Mr. Morris had moved on in his life, he paid back restitution, he had not committed any further offenses, he was a first offender in this case. And the district court specifically found there's no need to deter him. The district court emphasized deterrence to others and punished the need for punishment, but I think underemphasized the need to consider one of the 3553 factors, which is sentencing disparity. And here's a case in which the principal – there were three principals involved. There was Levine, there was Iskowitz, and there was Einhorn, who was the attorney who really facilitated this and made this happen. Einhorn never got prosecuted, despite the government saying he's under investigation and we have two separate investigations against him. And frankly, I think that the defense was deprived of the opportunity to call him as a witness because of these concerns about, well, we're not going to immunize him, he's under investigation. It is suspect he was never charged. He's still – I looked last night, he's a member in good standing at the California State Bar. He could be arguing here tomorrow, for all I know. But he, in the government's eyes, was a principal, no charge. Levine is getting resentenced next week, and we don't know what he will get. He got 25 years. But Iskowitz cooperated with the government. He clearly was two levels above Mr. Morris in this case, benefited substantially, earned millions of dollars, and he received a sentence of 71 months. Now, I understand in the government has cited cases that the court properly can consider cooperation. But I think that in looking at how the public reacts and what is fair and just in a case such as this, even given cooperation, even given a defendant who goes to trial, to sentence one defendant to more than double the amount of time to a sentence of close to 12 and a half years, when the principal gets half of that, it's just not fair. And I think that given the timeframe of this, which is right after the amyline came down, I would strongly urge the court to, if the court does, in fact, affirm the conviction, to permit Judge Moskowitz, now that it's been more than a year, actually almost two years since we've had the original sentencing in this case and a little bit longer since we've had amyline, I think if the court has a new opportunity to conclude, and I hope that this court concludes that it was an unreasonable sentence in comparison to the other defendants. And just finally, when you look at the 3553 factors in sentencing disparity, in some of the other defendants that were in this case or related to this case, there were defendants who both cooperated and who did not cooperate, who entered into plea agreements with the government that limited the amount of loss. And we've cited that in our briefs, but defendants who had the identical position as Mr. Morris, head of an ISO or an independent sales office that raised about somewhere between three and four million dollars, where the plea agreement before cooperation was, we'll start with that amount of loss or some significantly lower amount of loss starting at a sentencing range of 80 to 90 months, and then grant a downward departure for cooperation from there. And to me, although the Supreme Court has certainly said that the reduction for acceptance of responsibility that a defendant gets for pleading guilty is not, or the inability to get that after a defendant goes to trial is not a punishment for going to trial. I think in this case, when you see what happens to the other defendants, the fact that Mr. Morris got such a dramatically higher sentence than all the other defendants who were similarly situated to him who didn't go to trial, I think that in emerging the court to find that this is a trial tax or a trial toll that's out of proportion to what the acceptance of responsibility reduction normally, I mean, the sentencing difference should be maybe a year or two, not. And all the others who pled guilty testify for the government? No, there were at least one or two. And when I, I'll take a look at my notes and in a few minutes I can describe that. But there was one who pled guilty after the trial who was in, I think, an identical situation and received a sentence of somewhere between five and six years. There were other, most of the defendants did cooperate though. That is true. Have you calculated under the guidelines how much difference it would make if your client, the loss attributed to your client's activities were 3.5 million as opposed to 49? I have to take a look at my notes on that, Your Honor. I did take a look at it last night. It's substantial, I assume. But have you done that? You've done the calculation. I'm going to go through that again. Unfortunately, I'm a pinch hitter in this case, but it would have been significantly lower. At the time of the original sentencing, the defense was asking for a sentence in the four to five year range based on the amounts of loss that were involved. Okay. Thank you, counsel. You can reserve the rest of your time for rebuttal. May it please the Court. My name is Steve Peek. I'm an assistant U.S. attorney, and I'll be covering all the issues but the sentencing issues. Lawrence Kasper, my colleague in San Diego, will be covering the sentencing issues. Your Honors, the appellate's brief, both the opening brief and the reply brief, and to a certain extent, Mr. Warren's presentation today totally mischaracterized the facts as far as how the trial went. Now, I can certainly understand Mr. Reagan, the lead appellate counsel, didn't attend the trial. Mr. Warren didn't, as he indicated. And it's a huge, daunting task to go through a 90-volume record that transcended about a four and a half to five month trial in about four to six months. of weekly motion hearings before that. I'd like to set the record straight as to really what happened in three areas. I'll only cover two if the Court doesn't want to get into some of the areas that Mr. Warren didn't cover, but certainly three points need clarification. The defenses presented by the defendants were not irreconcilably antagonistic. In fact, they were complementary and mutually self-reinforcing and mutually supportive. Second, there was only a limited amount of 404B evidence that came in against Mr. Morris, and contrary to Mr. Warren's assertion, the Court gave many, many limiting instructions and curative instructions during the course of the trial. And in the process of doing that, the judge blended curative instructions in the context of severance and curative instructions in the context of 404B. Moreover, there were no broad sides. In the opening brief and the reply brief, it consistently raises the allegation that Mr. Leonard's counsel, Mr. Iredale, constantly attacked telemarketers as liars and deceitful and that type of thing to paint Mr. Morris as a telemarketer in a bad light. Certainly, Mr. Iredale attacked the government's witnesses who were cooperating defendants to be that way, but he never made any broadside attacks about telemarketers generally. Moreover, the Court disagreed that the conduct and the comments by Mr. Iredale were antagonistic to Mr. Morris's defense, and that's even in the excerpts of record at 329 and 332.  Leonard's counsel, Iredale, had four main themes throughout his opening statement, that Iredale or, excuse me, that Iskwitz had many lawyers and Leonard was just one of them, that Leonard received a very little bit of money, and that he was a man of his word. And that for the work he did and what he did, he thought was absolutely proper legal work, that Iskwitz was a manipulative man who falsely represented himself to everyone involved and victimized the people who worked with him, implicitly the ISO owners, the salespeople, and his partners, and that the cooperating defendants testifying in the case were all liars who were seeking a lower sentence. He only mentioned Mr. Morris twice in his opening statement, and they were not disparaging comments. Moreover, the defense attorneys as a group tried to harmonize the defenses, and they basically had a couple of themes, good faith and where appropriate advice to counsel, which is what Mr. Morris did. And the court commented, and certainly the government saw, a concerted effort throughout the trial to get along and attack the government's evidence, but not attacking each other. Mr. Cass, who didn't make an opening statement, did, throughout his cross-examination of the government's witnesses, also advance certain themes. First of all, that Mr. Morris had a very professional approach to his work. He had a good faith belief in the legitimacy and the viability of the offerings that his salesmen were selling, that the information provided to the ISO owners, Morris himself and the investors and the salespeople, conveyed the idea that the offerings were legitimate and had value and could make money for them. He asserted that the corporate office, Itzkowitz, Levine, and the other partners up there, misled the ISO owners and investors at the same time. Through his cross-examination of the government's witnesses, including the victim witnesses, he aggressively advocated that full risk disclosure was in the private placement memorandum, and that if the investors invested and lost the money, well, that's the way the investment world is. And that, moreover, they were viable projects that the investors could have made money on if they had just persevered. He also attacked the credibility of the cooperators, as did the other defense counsel. In the defense case, he did present the advice of counsel, but unlike how it's argued in the defense brief, that was not the only defense. That was only a part of his defense. And why it was only part of his defense? There was very limited evidence that went to the advice of counsel arguments. So he focused primarily on good faith of Mr. Morris. As to the testimony of the advice of counsel, it came during Mr. Morris's testimony. He did take a stand in the defense case, which came literally about the third, fourth month of trial. And he testified that after receiving a letter from the Department of Corporations here in California in May of 96, that they thought his office was selling securities, he contacted Mr. Einhorn. And Mr. Einhorn referred him to an opinion letter written by another attorney named Mr. Hanrahan about a different offering. And that he then conveyed that other opinion letter to the Department of Corporations that, I don't think I'm selling securities, this letter supports that, I'm not going to contact you any further. That's the thrust of his discussion about Einhorn during his testimony. He did mention that he had discussed cease and desist or desist and frame letters that his office had received. But he was not specific as to when that had happened. So as far as the evidence in the record, he talked to Mr. Einhorn sometime in May of 96. Why is that important? Well, the scheme started in July of 94. So we're almost 20 months into the scheme where we first hear that there was some advice of counsel involved. He also talked about seeing an attorney named Raskin here in the Los Angeles area about tax issues. And that happened sometime in April of 97, just a couple of months before the complete telemarketing scheme ended. And that he and his wife saw the lawyer and they took some action in moving some money overseas to Hong Kong as a result of that tax advice. And he also said that he talked to Mr. Raskin about workers' compensation or independent contractor issues with Mr. Raskin. But he didn't say when. So as far as the jury heard, this advice of counsel came very late in the game. That's why the government believes Mr. Morris focused on good faith, because he could argue good faith throughout. And there was plenty of evidence that he presented it, that supported it. There was a lot of talk in both the opening brief and the reply brief that Mr. Einhorn, or excuse me, Mr. Iredale, on behalf of Mr. Leonard, introduced all this evidence about Mr. Einhorn's involvement. In fact, the bulk of the evidence about Mr. Einhorn came out in the government's case through the government's witnesses. And I would prefer the court to, and specifically, that's where the court found that Mr. Einhorn was a co-conspirator. That would be in volume 17 at 5838 through 5994. Now, these themes that Mr. Iredale and Mr. Katz raised in their, in Mr. Iredale's case, in his opening statement and through the witnesses, and more in Mr. Katz's case, through the testimony of the witnesses, was continued, were continued in the closing arguments. I reviewed those closing arguments recently in preparation for this hearing. Mr. Iredale's closing argument went for three days, parts of three days, 186 pages of transcript. It focused primarily on Itzkowitz, and he mentioned Mr. Itzkowitz's name 345 times in his closing argument. He talked about how Itzkowitz lied to Leonard, lied to the other lawyers, lied to Levine and his partners, lied to the IS owners and the salespeople, which supported what Mr. Katz was saying on behalf of Mr. Morris. He also testified that Itzkowitz lied to the jury during the trial because he wanted a lesser sentence, as did the other co-operators. He made zero references to Mr. Morris. Didn't mention him one time in his closing argument, nor, though, did he say, Mr. Morris's defense is obviously a different mind. If you believe him, you can convict me. If you believe me, you have to convict him. None of the defense attorneys said anything like that in any of their closing arguments. He made nine references to Mr. Levine, one of the co-defendants, but they were all factual discussions. No attacks, no disparagement, and he even alluded to Mr. Itzkowitz's manipulation of his longtime partner, Mark Levine. Again, supporting that, you know, the good faith argument still prevailed. He made 19, there were 19 pages of discussion about Irving Einhorn, but contrary to the defense argument that it was all that Mr. Einhorn was this kingpin of the conspiracy and involved in controlling it, most of it was in contrasting the legal work that Einhorn did among many lawyers. And throughout the testimony that Mr. Leonard presented, it showed that there were about 15 or 20 different lawyers involved with the Itzkowitz-Levine organization from about 1992 through about 1995 or 1996. And he talked about how Leonard had not been involved in SEC matters, that was Einhorn, and asset freezes, and handling the system refraining letters from California DOC, that was Einhorn, but he talked about what he did. So it wasn't attacking Einhorn in an effort to make Morris look bad, because Morris, as Joe Canvey said, innocently relied on the advice of a crooked attorney. He mentioned good faith on seven different pages, and he talked about Mr. Leonard's good faith, how he had initially got involved in universal wireless technologies with Mr. Itzkowitz and Mr. Levine, had given an opinion letter, referred him to other securities attorneys, and said, that was my client's, Mr. Leonard's first exercise of good faith, and he did it throughout the trial, or throughout his relationship. Now Katz, Mr. Katz, on behalf of Mr. Morris, had a three and a half day closing argument, transcript 475 pages. He referred to Itzkowitz a lot, 89 times, not as much, but certainly a lot of times, more than any other witness. He made references to Jim Leonard on 10 pages, and what did he talk about? The professional relationship that Mr. Morris had with Mr. Leonard. How Mr. Leonard had given this well-done opinion letter to Mr. Itzkowitz back at the time of universal wireless technology, saying that it wasn't securities, and that gave him some solace of what he was selling, and the 12 offerings in the indictment were not securities. He said, Leonard is the kind of person that Morris wanted to associate with, like Shucare and Einhorn, and he even referred some of his unhappy clients to Mr. Leonard to handle, and was happy with the way Mr. Leonard had handled it. So there was no attack on Leonard. He made one reference to Mr. Levine, and it was just in contrasting some testimony of a cooperator about Mr. Levine, and he disparaged and discredited that testimony. He mentioned Mr. Einhorn on 20 pages, and he did say that my client, Mr. Morris, relied on that advice, but he focused on Mr. Einhorn's long service with the SEC, his impressive office, his impressive practice, a lot of clients he knew in the industry. He said that he handled, he helped Mr. Morris with this California Department of Corporation letter in May of 96 that I referred to, and he said that the claims of Itzkowitz and the other cooperators about Mr. Einhorn should not be believed. 21 pages of references to good faith, where he talked about the Dixon Capital IPO materials that the conspirators used to avoid having another partnership meeting for the latter offerings. He talked about the experts in the field that were presented in the partnership meetings and the kickoff meetings, which gave an impression to the ISO owners and salespeople that this was a legitimate offering. The promotional materials he talked about that the investors got, his salespeople and the owners thought, this is a real deal. He said that Mr. Morris fired salespeople for misrepresenting to investors, and he argued the good faith instruction over and over and over to the jury about how the burden is on the government to show fraudulent intent. I don't have to show Mr. Morris good faith, but you've seen it throughout this trial. On advice to counsel, only six pages, and he talked about Einhorn, Raskin, and Hanrahan, but he didn't belabor advice to counsel. He then spent 19- He didn't have Mr. Einhorn's testimony, though. I'm sorry, Your Honor? He didn't have Mr. Einhorn's testimony, either. Well, Your Honor, there's a lot of discussion in the brief about testimony of Mr. Einhorn that came out about what Mr. Morris knew or not. There was not any testimony, hearsay testimony, that came in as co-conspirator testimony about Mr. Morris. Any conversations Mr. Einhorn had with Mr. Morris? No, I know that, but Mr. Einhorn was not able to testify because he was not granted immunity. Well, that's right, Your Honor, because he was a target of that investigation. We still wanted to prosecute him. He was a target in another investigation that was still proceeding that was not as far along. And we had no interest in giving him immunity in a situation where it would be a get-out-of-jail-free card, basically, in either case. He's never been charged? No, he has not. He has not been charged, unfortunately. He did – Mr. Katz spent 19 pages on his major theme, that these were viable, legitimate investments. And he spent a lot of time explaining to the jury why it is Mr. Morris and the other people believed that what they were doing was a real deal. That, again, supported. This is how these defenses were mutually supporting and not antagonistic. Everyone was blaming its squids. You state them so convincingly. It's amazing there was a conviction. Well, interestingly, Your Honor, Mr. Einhorn's relationship to this case was primarily on the securities fraud, because that's what his expertise was. Of all the charges Mr. Morris was charged with, he was acquitted on the object of the conspiracy to commit securities fraud and the object of the conspiracy to defraud, it alleged, conspiracy to defraud the SEC, the FTC, and the U.S. Treasury. The jury found that he was not guilty of that object. So the two securities-related components, the jury acquitted him. So they essentially accepted the defense presentation with respect to Mr. Einhorn. Finally, on the severance issue, Your Honor, at the end of the government's case, at the time of the Rule 29 motions, they renewed their severance motions. And Judge Moskowitz specifically went through and explained to all counsel that all the fears that everyone had at the beginning of the case about antagonistic defenses and spillover of prejudicial evidence had not transpired, that the counsel had been very diligent in trying to prevent that from happening and they had been successful. I'm going to skip over the confrontation issue, unless the Court has any questions. And I think I'm going to only spend a couple of minutes on the ---- You better leave some time for Mr. Casper. Yes, it is. And if you have no questions on 404B, I just want to stress there were many, many limiting instructions. I have a couple of listings that I'd be glad to provide the Court that show 15, 20 limiting instructions in detail about all the various issues of the 404B evidence. And if you'd like to do that, I'll ---- I think we have that issue in hand. All right. Thank you, Your Honor. May it please the Court, Lawrence Casper for the United States. Your Honor, I want to briefly address for the Court, Your Honors, I want to briefly address the specific issues that Mr. Warren addressed in his presentation and then take any questions that the Court may have. Would you start with the loss calculation? Certainly, Your Honor. Just to make sure that we cover that. Certainly, Your Honor. And I will do that immediately. And then I also want to address for the Court the background and magnitude of this fraud. I think it's important to put this in context. With respect to the amount of the loss, Your Honor, the method used by the Court below to calculate the actual loss here, which was the out-of-pocket investment by investors, and that amount, Your Honor, was stipulated, too, by Defendant Morris, was fully consistent with Section 2F1.1 of the Guidelines. It was also fully consistent with Application Note 7 and 1B1.3a sub b. Well, it made quite a bit of difference to attribute all the loss to this defendant, 49 million, as opposed to the 3.5 in which his operation generated. Your Honor, I would urge the Court to take a look at the Blitz decision, telemarketing case. In that case, Your Honor, this Court held that we agree with other courts of appeal which have held telemarketers responsible for the losses caused by other telemarketers and their fraudulent companies. And the appellant here cites the Studley decision, the Second Circuit case. That case, Your Honor, Studley was merely a sales representative. He was not an owner-manager of a room, as was Mr. Morris. The Court there said Mr. Studley had no interest in the success of the operation as a whole and took no steps to further the operation beyond executing his individual sales. So there was some evidence, I think, that the defendant knew of the Florida operations. Was there any other evidence that he knew of? Not only was he knowledgeable, Your Honor, about the Florida operations, he participated in each of these ventures in meetings. They had, in each venture, we described in our brief, they had a kickoff meeting. He participated in, I believe, it was six out of the eight, six out of eight kickoff meetings, or at least six, I think he admitted in his testimony. He participated in those meetings. During one of those meetings, which was for, I believe, the BureauNet partnership, we put in the record an audio tape that was prepared by the co-conspirators. They basically taped their meeting, which shows the full extent of the fraud. Mr. Morris participated in that meeting, and it is a good example for the Court to show how involved Mr. Morris was, how he participated in meetings which described and made him fully knowledgeable of the full extent of the fraud perpetrated by his room and other rooms across the country. How do you explain the sentencing disparity? Your Honor, with respect to sentencing disparity, there are, and I think here's where it's important, Your Honor, to take into account Judge Moskowitz's role in this case. Your Honor, going back, in this case, the government investigated this case for about three years, or almost three years. The Court took 20 pre-indictment guilty pleas in five related cases, and subsequently, in 2001, a grand jury indicted 20 more defendants. Now, with respect to those 20 pre-indictment guilty pleas, Judge Moskowitz himself took the vast majority of those. He handled each of those five cases himself. So he was intimately involved and familiar with all of the defendants in each of these cases who came before him for sentencing. There were also, of the 20 additional indictments, 13 who pled guilty before trial, and ultimately six went to trial, one died. But again, Judge Moskowitz sentenced many of those individuals. With respect, Your Honor, the Court below plainly recognized its obligation to take into account the others who pled guilty and what they did, what sentences that they got. There are numerous instances, for example, at SCR page 1914, SCR 1872. There are numerous instances in the record that I'd be happy to cite for the Court, but I don't want to take too much time here. Your Honor, with respect to this issue, the – and, Your Honor, I see my time is up. Yes.  Thank you, Your Honor. Your Honor, with respect to this issue, the other defendants expressed remorse for their conduct. Many of those were cooperators. For example, with respect to Mr. Iskowitz, and I know that that's been a central focal point here, he came in early. He cooperated. He provided substantial testimony on the witness stand for roughly 11 days and 3,400 record transcript pages. Again, he expressed remorse, and ultimately, Judge Moskowitz, in the sentencing portion of the discussion, there was pressure against Iskowitz cooperating by Mr. Levine. He did make the government's case, and I thought he was truthful at trial, having watched his testimony. So he got the benefit of his cooperation. That was the case with many of the others. The appellant, in his brief, incorrectly claims that the Court did not consider certain individuals, Mr. Grayson, Mr. Bolenback, and Mr. Evangelist. At SCR pages 1887 and 1888, the Court did take into account their sentences. And, Your Honor, with respect to one of those who was not a cooperator, Mr. Diamond, he was a salesperson, not a room owner, not a manager. He was a substantial reloader. He pled guilty before trial, unlike Mr. Morris, and he was sentenced to 88 months. I do believe, Your Honor, that the Court here carefully weighed each of the sentencing factors, including sentencing disparity, did a careful analysis, which is reflected in the record in the sentencing transcript, which we've attached in Volume 8 of our SCR. And in that transcript, I believe it does demonstrate the Court's cognizance of this issue and demonstrates his consideration of the other individuals who were sentenced. Your Honor, finally, after weighing up the factors on both sides of the equation, the Court came down with a sentence that was 87 months below the low end of a properly calculated guideline range. This factor of weighing sentencing disparity may well have played into the judge's and I think did play into the judge's decision on sentencing. He certainly took it into account, and it benefited Mr. Morris in the Court's ultimate sentencing here. For these reasons, Your Honor, and for those reasons stated by my colleague, Mr. Peek, we would ask the Court to affirm the decision of the district court in all respects, unless the Court has any other questions. Thank you, Your Honors. Thank you, counsel. Rebuttal. I know my time is limited. I just wanted to touch on a couple of things. In terms of the sentencing guidelines I took a look, at least for the fraud counts, based on $3.5 million of loss using the now relatively ancient guidelines that were applicable, and including an enhancement for aggravating role in the offense, my calculation is that he'd be at a level 22, which would be 41 to 51 months, that money laundering guidelines would be substantially higher than that, probably somewhere around double that. But in terms of the so obviously very significant distinction, my review of the record in terms of the sentencing that the other defendants received who did not go to trial, one was a man named Shane, S-H-E-Y-N. He was identified in the indictment as an ISO manager, basically the same position as Mr. Morris. He pled guilty and received a 37-month sentence. A gentleman by the name of Grayson, who did cooperate, and Shane did not cooperate. He pled guilty after the trial. Grayson was also, I believe, an ISO manager. He pled guilty, cooperated. He also pled guilty to tax fraud. Mr. Morris was not charged with tax fraud. He paid his taxes on his income. Grayson, pardon me, received 46 months, but his plea agreement started at a sentencing range of 70 to 87 months. And so part of our argument on fairness is that the government, for whatever reasons in terms of negotiating with people who were cooperating, said, we'll limit your amount of loss. We'll start you at just what you're individually responsible for. And it does reek, in my opinion, of unfairness to say, okay, not only do you lose acceptance of responsibility for going to trial, but you get hammered for $50 million of loss, of which Mr. Morris, in this case, earned $300,000 and paid his taxes on it. And then after it all came apart, started paying restitution before he was charged in the case. A gentleman by the name of Bullenbach received 54 months. An evangelist received 66 months. Both were operators of independent sales offices, basically people like Mr. Morris who had a group of people working for them doing the telemarketing. In terms of the Blitz case. What was the loss calculations in those cases? Well, I don't know. I wasn't at the sentencing hearings. But I would imagine that they were each of the sales offices earned or raised, I should say, between $3 and $4 million. And so just sort of doing the math in reverse, I think that the government must have agreed that the sale, okay, your loss is $3 to $4 million under the guidelines and it gets you in those sentencing ranges. Were they both cooperating witnesses? Grayson, pardon me, Bullenbach and Evangelist did cooperate. And so, but they also had to admit tax fraud violations. Were they salesmen? I believe they were ISO people similarly situated to Mr. Morris, people who ran sales rooms. I know their government's out of time. I certainly have no objection to the government putting input on this, because I'm sure Mr. Peek knows exactly what their positions were. But I believe they were sales managers like Mr. Morris. Tell us on the record. And then just in terms of the Blitz case, which Mr. Casper raised in the Studley case, the Blitz case, as I understand it, says, look, you're responsible for other telemarketers you're working with in the same boiler room, as they call them, the same people. But it doesn't say you're responsible for this room and that room and the other rooms in other parts of the country. These were scattered from L.A. all the way to Florida. And so I think this is somewhere between the Studley case where they say, look, you're just accountable for exactly what you individually did if you're not aware of other people, and the Blitz case where they said, okay, you're responsible for your little group that's working with you. And with that, I'll leave it. Thank you, counsel. Thank you all for your arguments. I know you had to cram a lot into a short amount of time, and I want to thank all of you for doing that very efficiently and effectively. We'll be in recess. And Rob, would you let us know when the attorneys are present for the last argument? Okay.
judges: Canby, Thomas, Conlon